[No. C016759. Third Dist. Nov. 18, 1994.]

EDWARD R. STOLZ II, Plaintiff and Appellant, v.
KSFM 102 FM et al., Defendants and Respondents.

**[Opinion certified for partial publication.\*]**

_____

*Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication
with the exception of parts II, III, IV and V of the Discussion.

**COUNSEL**

John S. Sargetis for Plaintiff and Appellant.

Hardy, Erich, Brown & Wilson and Bruce E. Salenko for Defendants and Respondents.

**OPINION**

**SIMS, J.**—In this defamation action, plaintiff Edward R. Stolz II, doing business as KWOD 106.5 FM, appeals from a judgment upon a jury's verdict in favor of defendants KSFM 102 FM, Genesis Broadcasting Co., and Chris Collins. Plaintiff contends the trial court erred in (1) determining he is a public figure and the speech involved matters of public concern, (2) instructing the jury that to establish falsity of the allegedly defamatory statements the "gist" of the information must be false, (3) admitting negative evidence of plaintiff's reputation, and (4) failing to instruct the jury that certain statements were slanderous per se. Plaintiff also contends no substantial evidence supports the defense verdict.

In the published portion of this opinion we conclude the trial court correctly ruled plaintiff was a public figure and the speech involved matters of public concern. In an unpublished portion of the opinion, we reject plaintiff's remaining contentions of error. We shall therefore affirm the judgment.

### Factual and Procedural Background

Plaintiff is the owner, operator, and general manager of radio station KWOD 106.5 FM in Sacramento, licensed and regulated by the Federal Communications Commission (FCC).

On June 13, 1989, KWOD disc jockey Pat Garrett made derogatory remarks about homosexuals on the air. He began by saying his girlfriend had left him for someone named Bruce, a name which undoubtedly belonged to a "limp-wristed queer," a "faggot." Garrett encouraged listeners to call in during the broadcast with similar comments. One caller stated words to the effect that all homosexuals should be killed.

The broadcast generated a reaction in the Sacramento community. An article in the Sacramento News and Review reported that KWOD's broadcast had inflamed the homosexual community, which was planning a boycott of KWOD and its advertisers. Another radio station, KFBK, devoted a program to the incident. In response to complaints from members of the homosexual community, a mediator from the Sacramento Human Rights and Fair Housing Commission met with KWOD representatives, who after some resistance ultimately broadcast an apology.

On June 30, 1989, Sacramento radio station KSFM made the incident the subject of an on-the-air discussion about irresponsible radio broadcasting during KSFM's "Morning Zoo" program. KSFM employees Chris Collins and Mike Reynolds specifically referred to KWOD as the subject of their comments, took calls from listeners during the two-and-one-half-hour program, and encouraged listeners to contact the FCC to complain about KWOD.

One caller stated he had called KWOD after KWOD's broadcast to complain the derogatory remarks about homosexuals were comparable to racist remarks such as "nigger" or "jungle bunny," which certainly would not be uttered on the air. According to the caller, the KWOD disc jockey said he accepted the challenge and would utter such racial slurs on the air in the future. Although the KWOD disc jockey did not make racist remarks on the air, this call to KSFM generated the following comments on the air by KSFM employees, *related to the issue of race*:

1. "The radio station should be part of your life to educate you and it shouldn't, in fact, promote violence within you to go out and beat up . . . people such as gays or *blacks* because they happen to be gay or *black*." (Italics added.)

2. "It's so bad when people hear on the radio 'yeah, you faggot, you queer, *you're nothing but a Nigger.*'" (Italics added.)

3. "Instead, a snot-nosed runty little punk who thinks his ego can run the radio station, goes on and calls people faggot and queers, *and calls black people Niggers and jungle bunnies.*" (Italics added.)

4. "I don't think a[] []responsible act is for a manager of a radio station to allow a gentleman to call gay people faggots and queers and *to call black people niggers and jungle bunnies.*" (Italics added.)

Toward the end of the Morning Zoo program, Collins also made the following comments on the air:

1. "[I]f you allow your station van to allegedly have underaged girls in it performing sex with members of your staff which allegedly has happened with other radio stations in town, then you are an irresponsible broadcaster no matter what it is."

2. "If yours is a station that has people with underaged girls screwing them in the back of the van."

The source of these references, as explained by Collins at trial, was a former KWOD employee, who in 1985 told Collins that while employed at KWOD he had on one occasion had sex in the KWOD van with underage high school girls.

In proceedings *in limine*, the trial court ruled that plaintiff is a public figure, thereby imposing upon plaintiff the burden to prove falsity of the allegedly defamatory communications and "actual malice," i.e., that defendants made the statements with knowledge or reckless disregard of their falsity. The trial court further found the speech involved matters of public concern, thereby imposing upon plaintiff the burden to prove falsity regardless of his status as a public figure. The trial court also ruled that the statements about sex with minors were slanderous per se, because they imputed criminal conduct, but left to the jury the question whether the race-related statements were slanderous per se, as alleged by plaintiff. Plaintiff's trial theory, as presented to the jury, was that all the statements were defamatory per se, such that injury to reputation was presumed and no actual damages needed to be shown.

Following a two-week jury trial, the jury returned a general verdict in favor of defendants.

Additional facts appear in our discussion.

DISCUSSION

### I. *Public Figure and Issues of Public Concern*

■ Plaintiff contends the trial court erred in ruling that he is a public figure and that the speech involved matters of public concern. We disagree.

The trial court ruled plaintiff is both (1) an "all purpose" public figure and (2) a "limited purpose" public figure by reason of having injected himself into the particular public controversy giving rise to the defamation. As will appear, the effect of the ruling that plaintiff is a public figure was to impose upon plaintiff the burden to prove that the allegedly defamatory statements were false and that defendants made the statements with knowledge or reckless disregard of their falsity.

■ The trial court also ruled the allegedly defamatory speech involved matters of public concern. This ruling independently imposed on plaintiff the burden to prove falsity of the statements, regardless whether plaintiff is a public figure or private figure. (*Brown* v. *Kelly Broadcasting Co.* (1989) 48 Cal.3d 711, 753, fn. 37 [257 Cal.Rptr. 708, 771 P.2d 406], citing *Philadelphia Newspapers, Inc.* v. *Hepps* (1986) 475 U.S. 767, 775 [89 L.Ed.2d 783, 792, 106 S.Ct. 1558].)

■ Thus, in a defamation action the burden is normally on the defendant to prove the truth of the allegedly defamatory communications. (*Lipman* v. *Brisbane Elementary Sch. Dist.* (1961) 55 Cal.2d 224, 233 [11 Cal.Rptr. 97, 359 P.2d 465].) However, in accommodation of First Amendment considerations (which are implicated by state defamation laws), where the plaintiff is a public figure, the "public-figure plaintiff must show the falsity of the statements at issue in order to prevail in a suit for defamation." (*Philadelphia Newspapers, Inc.* v. *Hepps, supra,* 475 U.S. at p. 775 [89 L.Ed.2d at p. 792]; *Brown* v. *Kelly Broadcasting Co., supra,* 48 Cal.3d at p. 753, fn. 37.) Additionally, "[i]f the person defamed is a public figure, he cannot recover unless he proves, by clear and convincing evidence [citation], that the libelous statement was made with '"actual malice"—that is, with knowledge that it was false or with reckless disregard of whether it was false or not.'" (*Reader's Digest Assn.* v. *Superior Court* (1984) 37 Cal.3d 244, 256 [208 Cal.Rptr. 137, 690 P.2d 610], citing *New York Times Co.* v. *Sullivan* (1964) 376 U.S. 254, 279-280 [11 L.Ed.2d 686, 706, 84 S.Ct. 710].)

■ The rationale is twofold: "First, [] public figures are generally less vulnerable to injury from defamation because of their ability to resort to

effective 'self help.' Such persons ordinarily enjoy considerably greater access than private individuals to the media and other channels of communication. This access in turn enables them to counter criticism and to expose the fallacies of defamatory statements. [Citation.] Second, and more significantly, [] public figures are less deserving of protection than private persons because public figures [] have 'voluntarily exposed themselves to increased risk of injury from defamatory falsehood concerning them.' [Citations.]" (*Reader's Digest Assn.* v. *Superior Court, supra,* 37 Cal.3d at p. 253, citing *Gertz* v. *Robert Welch, Inc.* (1974) 418 U.S. 323, 345 [41 L.Ed.2d 789, 808, 94 S.Ct. 2997].) Thus, public figures " 'can be said to have voluntarily exposed themselves to public scrutiny and must accept the consequences . . . .' " (*Live Oak Publishing Co.* v. *Cohagan* (1991) 234 Cal.App.3d 1277, 1289 [286 Cal.Rptr. 198].)

■ "For the most part those who attain this status [of public figure] have assumed roles of especial prominence in the affairs of society. Some occupy positions of such persuasive power and influence that they are deemed public figures for all purposes." (*Gertz* v. *Robert Welch, Inc.,* 418 U.S. at p. 345 [41 L.Ed.2d at p. 808].) This category is designated "all purpose" public figure. (418 U.S. at p. 351 [41 L.Ed.2d at p. 812].) All-purpose public figurehead will not be lightly assumed; in order for a plaintiff to be deemed an all-purpose public figure, there must be "clear evidence of general fame or notoriety in the community, and pervasive involvement in the affairs of society . . . ." (418 U.S. at p. 352 [41 L.Ed.2d at p. 812].)

"More commonly, those classed as public figures have thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved." (*Gertz* v. *Robert Welch, Inc., supra,* 418 U.S. at p. 345 [41 L.Ed.2d at p. 808].) This "limited purpose" or "vortex" public figure is an individual who "voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues." (418 U.S. at p. 351 [41 L.Ed.2d at p. 812].) "Unlike the 'all purpose' public figure, the 'limited purpose' public figure loses certain protection for his reputation only to the extent that the allegedly defamatory communication relates to his role in a public controversy." (*Reader's Digest Assn.* v. *Superior Court, supra,* 37 Cal.3d at pp. 253-254.)

The designation of public figure may rest on either of these two alternative bases—all-purpose or limited-purpose. (*Gertz* v. *Robert Welch, Inc., supra,* 418 U.S. at p. 352 [41 L.Ed.2d at p. 812].) "In either event, they invite attention and comment." (*Id.* at p. 345 [41 L.Ed.2d at p. 808].)

■ The question whether a plaintiff is a public figure is to be determined by the court, not the jury. (*Denney* v. *Lawrence* (1994) 22 Cal.App.4th 927,

933 [27 Cal.Rptr.2d 556].) The trial court's decision is a "mixed question of law and fact. [The trial court] must determine the predicate facts upon which it then concludes whether, as a matter of law, a plaintiff is or is not a [] public figure. [Citation.] When the appellate court is called upon to review the trial court's decision in this regard, its standard of review is whether, after an independent review of the entire record, substantial evidence supports the trial court's decision. [Citation.]" (*Ibid.*; see also *McCoy* v. *Hearst Corp.* (1986) 42 Cal.3d 835, 842 [231 Cal.Rptr. 518, 727 P.2d 711].)

■ Here, plaintiff complains the trial court improperly made the public figure determination based upon argument rather than evidence. However, although the issue was determined *in limine* without presentation of evidence, our review looks to the entire record to see if substantial evidence supports the public figure determination. (*Denney* v. *Lawrence,* 22 Cal.App.4th at p. 933.)

■ We will first discuss whether KWOD is a public figure.[1]

At trial plaintiff testified KWOD has been in operation since 1975 and is a 50,000-watt station, which is "the maximum power which is allowed by law in this region of the country." Plaintiff conceded KWOD is "well known to the public." Plaintiff testified he promoted KWOD in the mid-1980's with the slogan "the number one hit music station, KWOD." A decline in ratings since that time would not mean that people were no longer aware of the radio station. In 1993, the Sacramento News and Review published an article identifying KWOD as "Sacramento's best radio station."

Additionally, in testifying at trial about KWOD's good reputation, plaintiff spoke of KWOD's pervasive power and influence on community affairs. Thus, he testified KWOD "is there for the purpose of entertaining and informing the public and, hopefully, committing to a degree of community service." He also stated: "Since the first day of operation, KWOD has been committed to a variety of good works in the community including participation in fund raisers for a variety of charitable organizations and foundations. [¶] Furthermore, we have developed and programmed large numbers of independently produced radio programs which have been tuned to meeting certain problems and needs within the community. [¶] Lastly, the radio station has been engaged in providing free services to literally, literally tens of thousands of community organizations, clubs, groups, since day one in publicizing their events and matters that they believe are of significance to their own members."

[1] A business entity may be the subject of defamation. (*Vegod Corp.* v. *American Broadcasting Companies, Inc.* (1979) 25 Cal.3d 763, 770 [160 Cal.Rptr. 97, 603 P.2d 14] [corporation].)

According to plaintiff, KWOD engages in much more public service programming than other radio stations. He gave examples of some of the issues addressed in KWOD's public service programming—youth suicides, causes and treatment of birth defects, lung ailments, the common cold, stress, consumer affairs, taxes, Sacramento light rail system, and an open forum on Sacramento transportation issues. "There were thousands" of such programs. Plaintiff also testified KWOD regularly participates in fund raising events for the March of Dimes, Sacramento SPCA, American Heart Association, and other organizations. According to plaintiff, the reason for involving the station with community service is that "this is the only independently owned and locally owned radio station in the entire community. As a local resident, this is a way of giving something back to the community. It is, in fact, a good proposition in order to maintain close contact and rapport with our audiences."

The allegedly defamatory communications were broadcast by a Sacramento radio station which competes in the same market as KWOD.

This record sufficiently demonstrates that KWOD is an all-purpose public figure by virtue of occupying a position of general fame and pervasive power and influence in the community in which the allegedly defamatory speech was broadcast. (*Waldbaum* v. *Fairchild Publications, Inc.* (D.C. Cir. 1980) 627 F.2d 1287, 1295-1296, fn. 22 [201 App. D.C. 301, 627 F.2d 1287] [nationwide fame is not required; question is whether plaintiff has achieved notoriety in community where he was defamed].) Thus, KWOD's control of the airwaves allows it to reach a wide audience. KWOD thrusts itself into the public eye on a daily basis, seeking public attention. KWOD has pervasive involvement in the affairs of society by selecting and presenting public affairs programs on a wide range of topics. Thus, KWOD has "voluntarily exposed [itself] to public scrutiny and must accept the consequences . . . ." (*Live Oak Publishing Co.* v. *Cohagan supra*, 234 Cal.App.3d at p. 1289.) Moreover, KWOD is less vulnerable to injury from defamation because of its ability to resort to effective self-help through access to the media. (*Reader's Digest Assn.* v. *Superior Court, supra*, 37 Cal.3d at p. 256 [access to media is a key factor in determining public figure status].) Indeed, KWOD not only has *access* to the media; it *is* a medium.[2]

We conclude KWOD is an all-purpose public figure.

[2]Defendants contend the fact that KWOD is subject to FCC regulation is another factor in assessing public figure status. (*Reliance Insurance Co.* v. *Barron's* (S.D.N.Y. 1977) 442 F.Supp. 1341, 1348].) However, *Blue Ridge Bank* v. *Veribanc, Inc.* (4th Cir. 1989) 866 F.2d 681, criticized *Reliance* and rejected the proposition that a business enterprise loses the protection of defamation law by being subject to government regulation in the public interest.

This leaves the question whether plaintiff is a public figure as owner, operator, and general manager of KWOD. We conclude the answer is yes.

Thus, plaintiff brought this lawsuit in his own name "dba KWOD 106 FM," alleging he was and is "an individual conducting business as Radio Station KWOD 106 FM . . . ." The allegedly defamatory remarks referred to KWOD by name and only by extension to plaintiff as owner and operator of the radio station.

In *Live Oak Publishing Co.* v. *Cohagan, supra*, 234 Cal.App.3d 1277, we held a newspaper's managers were public figures for purposes of a slander suit. There, the newspaper published an article about a political candidate. A supporter of that candidate accused the newspaper and its managers of intentionally garbling the article to influence the outcome of the election, intentionally "crucifying" the candidate, and lying. (234 Cal.App.3d at pp. 1281-1282, 1287.) We determined both the newspaper and its managerial employees were public figures. (234 Cal.App.3d at pp. 1289-1290.)

"[A]n author, and especially a newspaper, often acts with the purpose of fostering public debate. ' "The Constitution specifically selected the press . . . to play an important role in the discussion of public affairs. . . ." ' [Citations.] A newspaper is uniquely possessed of 'sufficient access to the means of counterargument to be able "to expose through discussion the falsehood and fallacies" of the defamatory statements. []' [Citations.]" (*Live Oak Publishing Co.* v. *Cohagan, supra*, 234 Cal.App.3d at pp. 1289-1290.)

As to the newspaper's managers, we said: "[T]hese managerial individuals [] operated the newspaper. The owner and publisher, general manager and editors of the Escalon Times are intimately involved in public political debate in their community and the community has a legitimate and substantial interest in their conduct regarding the operation of the newspaper. [Citation.] We do not believe these plaintiffs were 'more vulnerable to injury,' justifying any special protection. [Citation.] They, too, are public figures." (*Live Oak Publishing Co.* v. *Cohagan, supra*, 234 Cal.App.3d at p. 1290.)

In *Live Oak Publishing Co.*, we did not specify whether the newspaper's managerial employees were all-purpose or limited-purpose public figures. However, we noted the community has a legitimate interest in their conduct *"regarding the operation of the newspaper."* (234 Cal.App.3d at p. 1290,

---

(866 F.2d at p. 688, citing cases in fn. 11.) We find it unnecessary to rest our opinion on the matter of government regulation.

italics added.) This language suggests the employees' public figure status might be limited to matters regarding the operation of the newspaper.

In this case, we have no occasion to determine whether plaintiff, as owner/operator of a radio station, might be deemed a public figure for all purposes. Thus, for example, we do not face a situation where plaintiff is accused of purely personal wrongful conduct, such as child abuse. Here, the offensive speech related directly to the operation and management of plaintiff's radio station. Thus, for present purposes, it is sufficient to conclude (and we do) that, at least with respect to matters directly related to the operation and management of his radio station, plaintiff is a limited-purpose public figure. We reach this conclusion for all the reasons, described above, that the radio station itself is a public figure. These reasons apply equally to plaintiff as the owner/operator of the station. (See *Live Oak Publishing Co.* v. *Cohagan, supra,* 234 Cal.App.3d at p. 1290.)

 We also conclude the trial court did not err in determining the subject matter of the allegedly defamatory speech involved matters of public concern. As indicated, this ruling independently imposed upon plaintiff the burden to prove falsity of the statements.

 "When the speech is of public concern and the plaintiff is a public official or public figure, the Constitution clearly requires the plaintiff to surmount a much higher barrier before recovering damages from a media defendant than is raised by the common law." (*Philadelphia Newspapers, Inc.* v. *Hepps, supra,* 475 U.S. at p. 775 [89 L.Ed.2d at p. 792].)

 Plaintiff argues that at the time of defendants' broadcast, there was no public concern regarding plaintiff condoning racist remarks over the air or allowing sex with minors in the KWOD van. However, plaintiff takes too narrow a view. " '[W]hether . . . speech addresses a matter of public concern must be determined by [the expression's] content, form, and context . . . as revealed by the whole record.' " (*Dun & Bradstreet, Inc.* v. *Greenmoss Builders* (1985) 472 U.S. 749, 761 [86 L.Ed.2d 593, 604, 105 S.Ct. 2939].) Here, the matter of public concern was irresponsibility in radio broadcasting. That was the topic of defendant's two-and-one-half-hour program. The trial court indicated that almost every page of the Morning Zoo transcript contained a reference to responsibility in broadcasting. The conceded purpose of radio is to inform as well as entertain. The pervasive power and influence of radio reaches into homes and offices, schoolyards and street corners. Radio reaches large numbers of people and even children away from parental supervision. For these reasons, we believe responsibility in broadcasting is a matter of public concern. That some statements, such as the "sex

with minors in the van" remarks, do not directly implicate broadcasting does not detract from our conclusion. "Freedoms of expression require ' "breathing space." ' " (*Philadelphia Newspapers, Inc.* v. *Hepps, supra,* 475 U.S. at p. 772 [89 L.Ed.2d at p. 790].)

We conclude the trial court properly determined plaintiff is a public figure for purposes of this lawsuit and the speech at issue is of public concern.

II.-V.*

. . . . . . . . . . . . . . . . . . . . . . . . . .

## DISPOSITION

The judgment is affirmed. Defendants shall recover their costs on appeal.

Puglia, P. J., and Sparks, J., concurred.

Appellant's petition for review by the Supeme Court was denied February 16, 1995.

---

*See footnote, *ante,* page 195.