[No. H024448. Sixth Dist. Mar. 24, 2005.]

JOHN VOGEL et al., Plaintiffs and Respondents, v.
JOSEPH FELICE, Defendant and Appellant.

**COUNSEL**

Robinson & Wood, Jesse F. Ruiz and Ann A. Nguyen for Defendant and Appellant.

William C. Dresser and Leslie Shearer for Plaintiffs and Respondents.

## OPINION

**RUSHING, P. J.**—In this action, two candidates for public office and their wives seek damages for libel and other torts based on statements posted on a public Web site. Defendant, who hosted the Web site and apparently authored the offending statements, brought a special motion to strike the complaint under the anti-SLAPP (strategic lawsuit against public participation) statute, Code of Civil Procedure section 425.16 (section 425.16 or the Act). The trial court denied the motion, apparently finding that the challenged statements could be shown to have exceeded whatever privileges might be afforded under California law and the federal Constitution. We have concluded that this was error. Plaintiffs' claims fall squarely within the Act, which therefore required plaintiffs to show that they could prevail on the merits. They failed to carry this burden. We will therefore reverse with instructions to grant the special motion to strike.

### BACKGROUND

In September 2001 plaintiffs John Vogel and Paul Grannis filed a complaint charging defendant Joseph Felice with libel, false light invasion of privacy, intentional and negligent infliction of emotional distress, and negligent damage to reputation.[1] The gist of the complaint was that from December 2, 1999, through November 2000, defendant "ran a website through www.geocities.com/bobvalenzuelasass [*sic*] and www.geocities.com/bobvalenzuelasass.isonfire.com," which "contained defamatory statements about Plaintiffs, including but not limited to, a list entitled 'Top Ten Dumb Asses,' " in which Vogel and Grannis were "listed as the number 1 and number 2 dumb asses, respectively." Plaintiffs alleged that the Web site "contained statements associating Plaintiffs with criminal conduct and fraud," and specifically noted "the statement 'J. J. Vogel's Wanted as a Dead Beat Dad,' which, when clicked upon, opened another web site dedicated to locating 'deadbeat dads,' " and "the statement, 'Paul Grannis—Bankrupt, Drunk & Chewin' tobaccy' which when clicked upon, opened a new web page associating Plaintiff Grannis with criminal, fraudulent, and immoral conduct." Plaintiffs alleged that additional (but unspecified) defamatory statements appeared in "[n]umerous e-mails and bulletin messages . . .

---

[1] The complaint also asserted causes of action for loss of consortium on behalf of plaintiffs' wives, Mary Vogel and Robyn Grannis. We have been advised by counsel that Mary Vogel's claims were separately resolved and dismissed while this appeal was pending. In any event there is no suggestion that the consortium claims have any vitality independent of the husbands' own tort claims. (See *Jablonski v. Royal Globe Ins. Co.* (1988) 204 Cal.App.3d 379, 388 [251 Cal.Rptr. 160].) Nor was there any attempt to substantiate the consortium claims, which were pleaded only in the most conclusory terms. (See *Anderson v. Northrop Corp.* (1988) 203 Cal.App.3d 772, 780–781 [250 Cal.Rptr. 189].) Accordingly we use the term "plaintiffs" to refer to John Vogel and Paul Grannis alone, and treat the remaining consortium claim of Robyn Grannis as standing or falling with her husband's causes of action.

sent and received through said web site" as well as in "[o]ther web pages in said web site," which "contained false and defamatory statements about Plaintiffs, including . . . patent associations with criminal and fraudulent conduct." It was further alleged that "[a]ll statements about Plaintiffs were false," that they were publicly accessible and read worldwide, and that "[t]he actions of Defendants [*sic*] were done maliciously and oppressively, and in conscious disregard of [plaintiffs'] rights . . . ."

Defendant brought a special motion to strike under section 425.16, asserting that at the time of the statements described in the complaint, plaintiffs were both candidates for local public office. In support of the motion, defendant filed a declaration asserting, among other things, that by virtue of their political candidacies, plaintiffs were public figures during the period of the Web site's operation. Defendant declared that plaintiff Vogel himself had a Web site during that period, that he headed a local organization called Advocates for Quality Home Construction, and that he "appeared in more than 100 newspaper articles and on Fox and NBC news." Defendant further averred: "At the time the subject websites were in operation, I believed there was substantial truth to the contention that Paul Grannis was 'bankrupt' as I knew that [he] had recently filed for bankruptcy and been [*sic*] provided with court documents which confirmed the filing of a petition for bankruptcy. [¶] . . . At the time the subject websites were in operation, I believed that there was substantial truth to the contention that Plaintiff John Vogel was delinquent or had been delinquent in his child support payments and had been provided with court documents which confirmed that proceedings had been brought to collect on unpaid child support obligations." Attached to the special motion to strike was an apparent copy of a chapter 7 bankruptcy petition filed by Paul and Robyn Grannis in September 1996, in the United States Bankruptcy Court for the Northern District of California. Defendant also requested judicial notice of pleadings and court records from child support proceedings concerning plaintiff Vogel in Schuylkill County, Pennsylvania, and Santa Clara County, California. Apparent copies of these materials indicated that in 1984, the Pennsylvania court entered an order requiring plaintiff Vogel to make payments of $30 per week toward the support of three minor children, plus "an additional $10.00 per week for arrearage." In 1987 the children's mother, Barbara Vogel, brought a complaint for support in that court alleging that she was raising the three children on an income of $6,000 per year, that defendant was residing in Santa Clara County, and that he had "refused and neglected to provide reasonable support for [her] and the other dependents . . . ." An accompanying statement asserted "arrearages" of $4,050 as of May 18, 1987, and a worksheet indicated that Vogel had paid no part of his support obligations to that time. In September 1990, plaintiff Vogel

filed a declaration in the Santa Clara County Superior Court, asserting that he was a full-time student with no income or assets and with household expenses exceeding his then wife's income. On December 9, 1990, the Santa Clara County Superior Court issued a bench warrant for Vogel's arrest. In April 1991, the court entered a stipulated order requiring him to pay monthly sums of $130 for child support and $45 toward an arrearage of $10,650 accrued from November 1984 to April 1991.[2] The court issued a wage assignment order to effectuate the support order.

In opposition to the special motion to strike, plaintiffs conceded having "r[u]n for an office in Hollister and lost." Their opposition memorandum essentially reiterated the allegations of the complaint. In a supporting declaration, plaintiff Vogel averred that the Web site "contained false and offensive statements about me including, 'J. J. the Dead Beat Dad owe[s] Wife and kids thousands.' This statement is false in that I do not owe my wife and kids thousands. [¶] . . . Defendant's website also contained the statement that 'J. J. Vogel's WANTED as a Dead Beat Dad.' This statement is also false. [¶] . . . The statement, 'J. J. Vogel's WANTED as a Dead Beat Dad.' served as a link [which] when clicked on, would lead the viewer to another website dedicated to locating 'deadbeat dads.' This patent association with a person who is wanted by the government is false and highly offensive. [¶] . . . Defendant's website also had a list entitled 'Top Ten Dumb Asses' in which I was listed as number 1. My name served as a link to a website with the address of www.satan.com. [¶] . . . [¶] . . . Defendant's websites also contained emails and bulletin messages containing false statements about me. [¶] . . . The entire content of the websites were [sic] false as it pertained to me and highly offensive."

Plaintiff Grannis similarly declared: "Defendant's website contained false and offensive statements about me including, 'Paul Grannis—Bankrupt, Drunk, & Chewin tobaccy.' This statement is false and highly offensive in that I am not an alcoholic or chew tobacco. [¶] . . . The statement 'Paul Grannis—Bankrupt, Drunk, & Chewin tobaccy' served as a link [which] when clicked on, would lead the viewer to another webpage with the address of www.olddrunk.com. This patent association of being a drunk was highly offensive. [¶] . . . Defendant's website also had a list entitled 'Top Ten Dumb Asses' in which I was listed as number 2. My name served as a link to a website with the address of www.bankrupta[**]hole.com. [¶] . . . Defendant's websites also contained emails and bulletin messages containing statements that I bankrupted many businesses throughout California. These statements were also false. [¶] . . . The entire content of the websites were [sic] false as it pertained to me and highly offensive."

---

[2] According to our calculations, at $45 per month it would take 19.7 years to discharge a debt of $10,650—excluding interest.

Also accompanying the opposition were (1) a declaration by Brian Conroy stating that he was ranked fifth on the list of "Top Ten Dumb Asses" and that his name was linked to a Web site with the address <http:www.idiot.com>; and (2) a declaration by Richard Scagliotti stating that he was ranked seventh on the list and was linked to the address <http:www.oldbuttman.com>. Each of these declarants stated that his depiction on the site was highly offensive, and that having his name linked "to a sophomoric website was also offensive and is not connected to a public issue."

Defendant objected to plaintiffs' supporting exhibits on a variety of grounds including hearsay, lack of foundation (i.e., authenticity), and relevance. Plaintiffs in turn filed objections on the eve of the hearing to defendant's own exhibits on grounds including relevance, hearsay, and excessive prejudicial potential.

The trial court heard the special motion to strike on February 5, 2002. The court sustained defendant's objections to all of plaintiffs' exhibits, as well as to the declarations of Conroy and Scagliotti. The court sustained plaintiffs' objections to all of defendant's exhibits except the bankruptcy petition filed by plaintiff Grannis and the vote totals offered to prove that plaintiff Vogel was a candidate for public office. The court then ruled that it was "going to deny the motion to dismiss at this point in time. I believe that the communication exceeded what would be—for purposes of pleading and at this stage of the proceeding, I believe that the evidence indicates that the communications exceeded what would be reasonably considered relevant as between interested parties." The court opined that the case of plaintiff Grannis "is more difficult to perhaps prevail on in the future because the allegation is that he's bankrupt. Well, in fact he did file a petition under Chapter VII . . . in, I think it was, 1997 or so. And generally I think you can file those petitions in bankruptcy once every seven years or so. So it's perhaps relevant for someone in the year 2000 or 2001 to consider the comments that Mr. Felice is making . . . I think the information is similar to, [d]o you want this guy running his city government when he can't even take care of his own personal finances? But I believe that there were other links on that Web site to other issues that I don't think were relevant. And so I'm denying the motion to dismiss on Grannis. [¶] On Mr. Vogel, I believe he has perhaps a stronger claim, in that it's alleged that he was a deadbeat dad in 1991. I think the court record is that he was in fact a deadbeat dad. That's the evidence. However, I don't know that at what point in time his status as a father who owed support was cured, and as of 1999 or 2000, Mr. Kim [i.e., counsel for

plaintiffs] is arguing, and he may have evidence to sustain this, that that was no longer the case. . . . I don't think the Web site was alleging that the person was previously a deadbeat dad and is that the kind of person you want controlling your government, it was he is a deadbeat dad. . . . [B]ut again, as in the Grannis case, there were other links on the Web site that tended to be less flattering."

On April 9, 2002, the court signed and filed a formal order denying the motion to strike and allowing defendant "thirty days from Notice of this Order to respond to Plaintiffs' complaint." Plaintiffs' counsel served notice of entry of the order on May 1, 2002. Defendant filed his notice of appeal on May 6, 2002. The order is appealable (§ 425.16, subd. (j)), and the appeal is timely (Cal. Rules of Court, rule 2(a), (f)).

DISCUSSION

I. *Applicability of Statute*

Section 425.16 is intended to bring about an early test of the merits in actions tending to chill citizen participation in public affairs. (See § 425.16, subd. (a) [declaration of legislative purpose].) The Legislature has directed that the statute "shall be construed broadly" in order "to encourage continued participation in matters of public significance." (*Ibid.*) The statute entitles a defendant to bring a "special motion to strike" (*ibid.*) any cause of action "arising from any act of [the defendant] in furtherance of [his or her] right of petition or free speech under the United States or California Constitution in connection with a public issue . . . unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim" (§ 425.16; subd. (b)(1)). The statute further provides, "As used in this section, 'act in furtherance of a person's right of petition or free speech under the United States or California Constitution in connection with a public issue' includes: (1) any written or oral statement or writing made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law; (2) any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law; (3) any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest; (4) or any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest." (§ 425.16, subd. (e).)

■ A defendant's attempt to invoke the protections of the statute thus raises three questions: (1) Does the challenged cause of action arise from conduct in furtherance of the defendant's petition or speech rights? (2) Was the conduct connected with a public issue? (3) If those questions are answered affirmatively, has the plaintiff established a probability of success on the claim?

■ In the present matter we find little room for doubt that the first and second questions must be answered affirmatively. Plaintiffs' own descriptions establish that the Web pages underlying their claims consist of "writing made in . . . a public forum." A common meaning of "forum" is "a medium (as a newspaper) of open discussion or expression of ideas." (Merriam-Webster's Collegiate Dict. (10th ed. 1999) p. 460.) All cases we have found considering public Web sites in this context have concluded that such a site constitutes a public forum within section 425.16. (*Wilbanks v. Wolk* (2004) 121 Cal.App.4th 883, 897 [17 Cal.Rptr.3d 497]; *ComputerXpress, Inc. v. Jackson* (2001) 93 Cal.App.4th 993, 1007 [113 Cal.Rptr.2d 625]; *Bernardo v. Planned Parenthood Federation of America* (2004) 115 Cal.App.4th 322, 358 [9 Cal.Rptr.3d 197].)

Moreover there can be no serious doubt that the conduct underlying plaintiff's claims was taken "in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech . . . ." (§ 425.16, subd. (e)(4); see *Wilbanks v. Wolk, supra*, 121 Cal.App.4th at p. 897 [§ 425.16, subd. (e)(4) has effect of extending statute to "private communications, so long as they concern a public issue"].) Indeed it is doubtful that this characteristic would ever be lacking where, as here, the conduct underlying the plaintiff's claims consists of pure speech. We therefore conclude that the conduct on which plaintiffs seek to predicate liability was of a character protected by section 425.16.

■ Nor can there be serious doubt that the challenged statements were made "in connection with a public issue or an issue of public interest." (§ 425.16, subd. (e)(4).) It is undisputed that both plaintiffs were candidates for public office at the time the offending Web pages were published. The character and qualifications of a candidate for public office constitutes a "public issue or an issue of public interest." (*Ibid.*; see *Conroy v. Spitzer* (1999) 70 Cal.App.4th 1446, 1451 [83 Cal.Rptr.2d 443] [the defendant's statements "obviously fell within the purview of section 425.16 because they · addressed a matter of public concern—a candidate's qualifications and conduct in office"]; see *Matson v. Dvorak* (1995) 40 Cal.App.4th 539, 548

[46 Cal.Rptr.2d 880], quoting *Aisenson v. American Broadcasting Co.* (1990) 220 Cal.App.3d 146, 154 [269 Cal.Rptr. 379] ["The right to speak on political matters is the quintessential subject of our constitutional protections of the right of free speech. 'Public discussion about the qualifications of those who hold or who wish to hold positions of public trust presents the strongest possible case for applications of the safeguards afforded by the First Amendment' "]; *Yorty v. Chandler* (1970) 13 Cal.App.3d 467, 472 [91 Cal.Rptr. 709], quoting *Eva v. Smith* (1928) 89 Cal.App. 324, 328–330 [264 P. 803] [" 'An individual who seeks or accepts public office invites and challenges public criticism so far as it may relate to his fitness and qualifications . . . . The right of criticism rests upon public policy . . . .' "].)

■ In an attempt to show that defendant's conduct fell outside the reach of section 425.16, plaintiffs suggest that their lawsuit will not "chill" speech because it seeks only damages for conduct already completed. The Supreme Court has already declared, however, that a defendant moving to strike under section 425.16 need not "demonstrate that the action actually has had a chilling effect on the exercise of such rights. [Citation.]" (*Navellier v. Sletten* (2002) 29 Cal.4th 82, 88 [124 Cal.Rptr.2d 530, 52 P.3d 703] (*Navellier*).) This makes it unnecessary to address plaintiffs' misapprehension of the term "chill," which in this context refers not to a direct interference with ongoing speech by injunctive or similar relief but to the inhibiting effect on speakers of the *threat* posed by *possible* lawsuits. (See *New York Times Co. v. Sullivan* (1964) 376 U.S. 254, 300–301 [11 L.Ed.2d 686, 84 S.Ct. 710] (*Sullivan*) (conc. opn. of Goldberg, J.) ["The opinion of the Court conclusively demonstrates the chilling effect of the Alabama libel laws on First Amendment freedoms . . . ."]; *Dombrowski v. Pfister* (1965) 380 U.S. 479, 494 [14 L.Ed.2d 22, 85 S.Ct. 1116] ["So long as the statute remains available to the State the threat of prosecutions of protected expression is a real and substantial one. Even the prospect of ultimate failure of such prosecutions by no means dispels their chilling effect on protected expression"].)

■ We conclude that the Act applies to plaintiffs' claims. This includes all of plaintiffs' causes of action, regardless of the underlying theories of recovery, insofar as they are "*based on* an act in furtherance of the defendant's right of petition or free speech. [Citations.]" (*City of Cotati v. Cashman* (2002) 29 Cal.4th 69, 78 [124 Cal.Rptr.2d 519, 52 P.3d 695].) Here all of the causes of action alleged by plaintiffs rest exclusively and entirely on defendant's conduct in publishing the offending statements on his Web site. Since that conduct fell squarely within the realm protected by section 425.16, all of plaintiffs' causes of action are subject to the statute.

## II. *Success on Merits*

### A. *Failure to Plead Actual Malice*

■  Once a defendant shows that the Act applies, the burden shifts to the plaintiff to demonstrate a probability of prevailing on the merits. (*Navellier, supra,* 29 Cal.4th at pp. 88–89, 95; § 426.16, subd. (b).)[3] "In order to establish a probability of prevailing on the claim (§ 425.16, subd. (b)(1)), a plaintiff responding to an anti-SLAPP motion must ' "state[] and substantiate[] a legally sufficient claim." ' [Citations.] Put another way, the plaintiff 'must demonstrate that the *complaint is both legally sufficient* and *supported by a sufficient prima facie showing of facts* to sustain a favorable judgment if the evidence submitted by the plaintiff is credited.' [Citations.] In deciding the question of potential merit, the trial court considers the pleadings and evidentiary submissions of both the plaintiff and the defendant (§ 425.16, subd. (b)(2)); though the court does not *weigh* the credibility or comparative probative strength of competing evidence, it should grant the motion if, as a matter of law, the defendant's evidence supporting the motion defeats the plaintiff's attempt to establish evidentiary support for the claim. [Citation.]" (*Wilson v. Parker, Covert & Chidester* (2002) 28 Cal.4th 811, 821 [123 Cal.Rptr.2d 19, 50 P.3d 733], first and second italics added, third italics in original.)

■  The complaint here is legally insufficient on its face. For one thing, it fails to plead that defendant made the challenged statements with "actual malice" as that term is used in *Sullivan, supra,* 376 U.S. at pages 279–280, i.e., "with knowledge that it was false or with reckless disregard of whether it was false or not." Such a mental state must be pleaded and proved by any candidate for public office seeking recovery for supposedly injurious statements relating to his or her suitability for office. (*Miller v. Nestande* (1987) 192 Cal.App.3d 191, 201 [237 Cal.Rptr. 359] ["Although both the *Coleman* and *New York Times* cases involved alleged libels pertaining to in-office conduct of public officials, the reference to the need to protect a free flow of information regarding qualifications of persons applying for, as well as already holding, public office compels the application of an actual malice standard to candidates for office"]; see *Beilenson v. Superior Court* (1996) 44

---

[3] Our consideration of this question has been needlessly complicated by plaintiffs' failure to clearly and comprehensively specify the statements by which they claim to have been injured. "The general rule is that the words constituting an alleged libel must be specifically identified, if not pleaded verbatim, in the complaint. [Citations.]" (*Kahn v. Bower* (1991) 232 Cal.App.3d 1599, 1612, fn. 5 [284 Cal.Rptr. 244].) In view of this rule we would be justified in disregarding any evidence or argument concerning statements not explicitly set forth in the complaint. As will be seen, however, *none* of the statements of which plaintiffs have complained in their various filings below was shown by them to furnish a ground for judgment in their favor.

Cal.App.4th 944, 952 [52 Cal.Rptr.2d 357] [special motion to dismiss properly granted; candidate for Congress was public figure, and record lacked "evidence upon which a reasonable fact finder could find that [the defendant] acted with the requisite malice"]; *Kapellas v. Kofman* (1969) 1 Cal.3d 20, 28–29, fn. 6 [81 Cal.Rptr. 360, 459 P.2d 912] [candidate for city council could recover only on showing of knowing or reckless falsehood]; *Noonan v. Rousselot* (1966) 239 Cal.App.2d 447, 452 [48 Cal.Rptr. 817] [candidate for Congress in primary election, though "not a 'public official' in the narrow sense," had to show actual malice as defined in *Sullivan*].)

The complaint here makes no attempt to plead a knowing and reckless falsehood. It contains only the conclusory boilerplate allegation that defendant acted "maliciously and oppressively, and in conscious disregard of [plaintiffs'] rights . . . ." Such an allegation is insufficient to state a cause of action in a case where actual malice of the *Sullivan* type is required. (*Noonan v. Rousselot, supra*, 239 Cal.App.2d at p. 454; *Kahn v. Bower* (1991) 232 Cal.App.3d 1599, 1615 [284 Cal.Rptr. 244]; cf. *Mullins v. Brando* (1970) 13 Cal.App.3d 409, 420, 421 [91 Cal.Rptr. 796] [holding sufficient an allegation that defendants published "with wanton and reckless disregard for the truth or falsity of the statements made"].)

Nor does plaintiffs' failure to plead a knowing or reckless falsehood affect only their claims for libel. Rather it constitutes a fatal defect as to all of their claims "hav[ing] as their gravamen the alleged injurious falsehood of a statement." (*Blatty v. New York Times Co.* (1986) 42 Cal.3d 1033, 1045 [232 Cal.Rptr. 542, 728 P.2d 1177]; see *Kahn v. Bower, supra*, 232 Cal.App.3d at p. 1615.) Since plaintiffs' entire case is predicated on such statements, the complaint as a whole, and each cause of action therein, fails to state facts sufficient to constitute a cause of action.

Plaintiffs seem to imply that defendant's statements were not constitutionally privileged because they did not relate to a matter of public concern. We doubt that this point has been presented with sufficient cogency to require that we address it, but it is any event readily dispelled. Assuming the doubtful proposition that the offending statements had to separately appear to address matters of public concern, there is no basis on this record to doubt that they did so. Plaintiff Vogel's asserted default on child support obligations, and plaintiff Grannis's reported petition for bankruptcy, had an obvious bearing on each respective plaintiff's character and fitness for public office.

Plaintiffs may be understood to suggest that Vogel's default and Grannis's bankruptcy were not germane to their electoral qualifications because they took place in the past. Again we may assume, without deciding, the potential pertinence of the argument as framed, and yet categorically reject it as inapplicable here. The determination of what facts are germane to a candidate's suitability for office is entrusted by our system of government to voters, not judges or juries. For that reason, persons commenting or reporting on a candidate's history must be allowed the broadest possible latitude. So long as past conduct has any arguable bearing on a candidate's honesty, integrity, prudence, judgment, wisdom, trustworthiness, responsibility, or any other trait fairly implicated by his or her aspiration to elected office, we would be very reluctant to permit the imposition of damages for an otherwise permissible report based merely on the premise that the passage of time has rendered the reported conduct irrelevant. (See *Beruan v. French* (1978) 56 Cal.App.3d 825, 828 [128 Cal.Rptr. 869] ["A charge of criminal conduct, no matter how remote, is relevant to a candidate's fitness for office"].)

We conclude that the complaint is deficient on its face and that since plaintiffs at no time offered to amend it in any pertinent respect, they failed to establish the requisite likelihood that they could prevail on the merits if allowed to proceed with the lawsuit. We are constrained to observe, however, that this point was never clearly raised by defendant as a distinct ground for dismissal. Therefore we will not rely on it for our own disposition (see Gov. Code, § 68081), but will proceed to consider whether plaintiffs carried their burden of showing an ability to *prove* their case on the merits.

### B. *Proof of Defamatory Utterance*

In support of their claims plaintiffs have identified three distinct defamatory assertions as well as a host of other less clearly defined features of defendant's website. We will first consider whether plaintiffs have demonstrated an ability to prevail on the basis of the distinctly described statements, which consist of the following: (1) Both plaintiffs are among the "Top Ten Dumb Asses." (2) Plaintiff Vogel is a "deadbeat dad" who "owed thousands" to his wife and children. (3) Plaintiff Grannis is or was "Bankrupt, Drunk, and Chewin' tobaccy." For a variety of reasons, none of these statements can sustain any of plaintiffs' claims.

The accusation that plaintiffs are top-ranking "Dumb Asses" cannot survive application of the rule that in order to support a defamation claim, the challenged statement must be found to convey "a provably false factual assertion." (*Moyer v. Amador Valley J. Union High School Dist.* (1990) 225

Cal.App.3d 720, 724 [275 Cal.Rptr. 494].) A statement that the plaintiff is a "Dumb Ass," even first among "Dumb Asses," communicates no factual proposition susceptible of proof or refutation. It is true that "dumb" by itself can convey the relatively concrete meaning "lacking in intelligence." Even so, depending on context, it may convey a lack less of objectively assayable mental function than of such imponderable and debatable virtues as judgment or wisdom. To call a man "dumb" often means no more than to call him a "fool." One man's fool may be another's savant. Indeed, a corollary of Lincoln's famous aphorism is that *every* person is a fool some of the time.

Here defendant did not use "dumb" in isolation, but as part of the idiomatic phrase, "dumb ass." When applied to a whole human being, the term "ass" is a general expression of contempt essentially devoid of factual content. Adding the word "dumb" merely converts "contemptible person" to "contemptible fool." Plaintiffs were justifiably insulted by this epithet, but they failed entirely to show how it could be found to convey a provable factual proposition. (See *Franklin v. Dynamic Details, Inc.* (2004) 116 Cal.App.4th 375, 385 [10 Cal.Rptr.3d 429] ["the dispositive question is whether a reasonable fact finder could conclude the published statement declares or implies a provably false assertion of fact"].) If the meaning conveyed cannot by its nature be proved false, it cannot support a libel claim. (See *ibid.*; *Sommer v. Gabor* (1995) 40 Cal.App.4th 1455, 1475–1476 [48 Cal.Rptr.2d 235].)

Nothing in the record before us suggests that the context in which the challenged statements were made would have infused them with a provably false meaning. Judging from additional portions of the Web site offered by plaintiffs in their opposition papers below, the Web site's overall tone was one of puerile vituperation and wretchedly excessive tastelessness. The ostensible author of the list of "Top Ten Dumb Asses," apparently a fictionalized figure, is *himself* presented as a "dumb ass," i.e., "Dumb Ass Bob," who purports to be providing "advice" to supposed readers who may or may not themselves be fictional or fictionalized. If the page containing the "Top Ten List" is any example, "Dumb Ass Bob" refers to his readers (real or concocted) as "dumb ass[es]." In fact, the main purpose of the page seems to be to employ the term "ass" as often as possible, preferably in conjunction with "dumb." In such a context it is inconceivable that placement on the "Top Ten Dumb Asses" list could be understood to convey any imputation of provable defamatory fact. This statement simply cannot support a defamation claim, or any other claim pleaded by plaintiffs.

## C. *Proof of False Utterance*

In contrast to the "Dumb Ass" charge, the statements that Vogel was a "deadbeat dad" and that Grannis was bankrupt, drunk, and "[c]hewin' tobaccy" are at least *capable* of conveying a provably false factual imputation. However, plaintiffs failed to substantiate their claims with respect to these statements, because they failed to make a prima facie showing that the statements were substantially false.

A public figure or public official who seeks to recover damages for a defamatory statement bears the burden of proving that the challenged statement was false. (*Stolz v. KSFM 102 FM* (1994) 30 Cal.App.4th 195, 202 [35 Cal.Rptr.2d 740].) The plaintiff cannot be said to have carried this burden so long as the statement appears *substantially* true. To bar liability, " 'it is sufficient if the *substance* of the charge be proved true, irrespective of slight inaccuracy in the details.' [Citations.] . . . [Citation.] . . . Minor inaccuracies do not amount to falsity so long as 'the substance, the gist, the sting, of the libelous charge be justified.' [Citations.] Put another way, the statement is not considered false unless it 'would have a different effect on the mind of the reader from that which the pleaded truth would have produced.' [Citations.]" (*Masson v. New Yorker Magazine* (1991) 501 U.S. 496, 516–517 [115 L.Ed.2d 447, 111 S.Ct. 2419], italics added [discussing California law].)[4]

Because plaintiffs were public figures, or quasi-public officials, with respect to their candidacies for public office, they could not demonstrate their ability to succeed on the merits without (1) identifying statements that conveyed a provably false and defamatory imputation, and (2) presenting evidence that the statements were in fact substantially false, i.e., diverged from the true facts in and to such manner and degree as to produce a more damaging effect on the mind of the reader than would the truth. Neither plaintiff came close to carrying this burden.

The primary factual assertions identified by plaintiff Vogel as false were that he was a "deadbeat dad" and "wanted" as such, and that he "owes Wife and kids thousands." His only evidence concerning the true facts was the averment, "I do not owe my wife and kids thousands." This is a "negative pregnant," i.e., "a denial of the literal truth of the total statement, but not of its substance." (5 Witkin, Cal. Procedure (4th ed. 1997) Pleading, § 995, p. 451.) By denying a debt in a specified amount, it leaves open the

---

[4] The passage just quoted suggests that the plaintiff may be under a burden to *plead* the "truth" concerning the matters embraced by the allegedly defamatory statement. Such a requirement would suggest yet another fatal deficiency in plaintiffs' complaint, which contains only the blanket generalization that "All statements about Plaintiffs were false." As appears below, this coyness about the actual facts pervades the record in the trial court and on appeal.

possibility of a debt in some other, perhaps substantially equivalent, amount. Thus if "thousands" means $2,000 or more, Vogel's simple negation leaves open the possibility that he owes $1,999.99, in which case the challenged statement remains substantially true.

Further, the use of the conjunction "and" in both the challenged statement and the denial raises a hosts of difficulties. In all likelihood the meaning of the challenged statement was that Vogel's combined debt to both his wife and children was at least $2,000. But the use of "and" in Vogel's denial ("I do not owe my wife and kids thousands") could mean a number of things: (1) the combined debt to his wife and children is less than $2,000; (2) the debt to his children is less than $2,000, but the debt to his wife may be greater; or (3) the debt to his wife is less than $2,000, but the debt to his children may be greater. This ambiguity becomes all the more striking considering the presumptive ease with which Vogel could have stated the true facts, i.e., how much he owed, and when and how the debt, or portions of it, were discharged. Vogel's failure to plainly refute the defamatory imputation by stating the true facts may be understood to imply that he did in fact continue to owe substantial amounts of unpaid child support.[5] Certainly it was insufficient to establish his ability to prove the substantial falsity of the imputations that he was a "deadbeat dad" who "owed thousands."

Plaintiff Grannis tacitly admitted the substantial truth of describing him as "bankrupt"; certainly he did not deny that he had filed a bankruptcy petition as asserted in defendant's moving papers. And he failed to demonstrate any *substantial* falsity in the characterization "Drunk and Chewin' tobaccy." He described this characterization as false, but never stated the true facts to which the statement would have to be compared in order to establish its *substantial* falsity. He denied being an alcoholic, but not that he consumed alcohol to the point of inebriation, or that he had done so often, or that he liked to do so. Similarly, he used only the present tense in denying that he

---

[5] If A asserts, "The car is red and blue," B's simple negation of that statement ("The car is not red and blue") fails entirely to disclose the car's true colors as asserted by B. He may believe the car is blue but not red; he may believe the car is red but not blue; or he may believe the car is neither blue nor red. Indeed his failure to plainly state what he *does* believe may justify a suspicion that he is engaged in a deliberate evasion, which in turn raises the question whether he may not have found some way to reveal even less than appears, most obviously by attributing some secret and unexpected construction to the proposition thus seemingly denied. So B might privately posit that "red and blue" refers to a *blend* of those two colors, justifying his denial of the original statement so long as the car is not *purple*. Presumably it was judicial frustration with such devices that led to the rule under which a pregnant denial in a *pleading* works to *admit* the allegation thus ostensibly negated. (5 Witkin, Cal. Procedure, *supra*, § 995, pp. 451–452.) We do not assume that the same rule should be invariably applied to averments in a declaration. At the same time, the commonsense principles underlying the rule do not become wholly inapplicable merely because pleadings are not involved.

chewed tobacco; for all the record shows, he might have chewed it in the very recent past, and might intend to chew it again in the future. Further, while some people may consider the chewing of tobacco an unsavory or even repellent practice, there is no indication that it carries such opprobrium that a false imputation of engaging in it works compensable harm to an individual's reputation. We also question whether any viewer of the site would take seriously an imputation couched in a whimsical dialect ("Chewin' tobaccy") and surrounded by persiflage and raillery of the most self-indulgent and fanciful sort.

Both plaintiffs also complain about other aspects of defendant's Web site. Thus they assert that defendant linked their names to certain Web addresses with objectionable names. For most of these complaints there is no indication of the actual content to be found at these addresses; rather, plaintiffs' complaints are based entirely on the *name* of the linked *address*. Thus Vogel complains that his name was linked to "www.satan.com," and Grannis complains that he was linked to "bankrupta[**]hole.com" and "olddrunk-.com." But merely linking a plaintiff's name to the word "satan" conveys nothing more than the author's opinion that there is something devilish or evil about the plaintiff.[6] Similarly, "bankrupta[**]hole.com" tied an undisputed fact (bankruptcy) to a derogatory epithet devoid of provable meaning. In the absence of a provably false assertion of fact, such imputations furnish no basis for recovery. Linking Grannis's name to the address "olddrunk.com" was not shown to convey a substantially false meaning.

Plaintiffs also complain that defendant's Web site contained scurrilous text as well as links to pornographic material on other sites. There is ·no suggestion that defendant asserted any factual association between this material and plaintiffs, or that the material would be understood to refer to them in any way. A defamation action may proceed only where the challenged statement conveys a meaning " 'of and concerning' the plaintiff." (*Blatty v. New York Times Co., supra*, 42 Cal.3d at p. 1042.) This limitation applies not only in defamation cases, but is constitutionally required with respect to "all claims whose gravamen is the alleged injurious falsehood of a statement." (*Ibid.*)

---

[6] Vogel also complains that defendant's Web site included a picture of him altered to "look like a devil." This grievance adds nothing of substance to the points addressed in the text. Similarly Vogel complains that his name was linked to "a Web site dedicated to locating 'deadbeat dads.' " This adds nothing to the direct assertion that he was a "deadbeat dad." Nowhere in the record do we find any basis for the notion that defendant's Web site portrayed Vogel as being sought by authorities.

■ Nor need we be long detained by plaintiffs' assertion that the Web site included emails and "bulletin messages" containing other statements defamatory of plaintiffs. The only evidence of any specific statement is the averment by plaintiff Grannis that the Web site included "emails and bulletin messages containing statements that I bankrupted many businesses throughout California." Such a statement might indeed support a judgment if shown to be attributable to defendant, substantially false, and made with knowledge of falsity or reckless disregard for the truth. However the record provides no basis to conclude that plaintiff Grannis could prove any of these elements. The owner or host of a Web site is not automatically liable for everything that appears there. (See Rest.2d Torts, § 581(1); Communications Decency Act of 1996, 47 U.S.C. § 230; *Carafano v. Metrosplash.com Inc.* (C.D.Cal. 2002) 207 F.Supp.2d 1055.) Nor does the record provide any basis to conclude that the statement is substantially false,[7] or was made with knowledge of its falsity or serious doubts about its truth.

D. *Other Matters*

■ Plaintiffs repeatedly emphasize that defendant's Web site was "anonymous," without explaining the intended meaning or significance of that characterization. While a speaker's attempt to remain anonymous might have some logical relevance in an otherwise colorable defamation action, it does not categorically dispel the protections of the First Amendment. On the contrary, "the First Amendment right of freedom of speech *includes* the right to remain anonymous." (*Huntley v. Public Util. Com.* (1968) 69 Cal.2d 67, 73 [69 Cal.Rptr. 605, 442 P.2d 685], italics added.) This right "clearly encompasses all forms of expression whether they be writings, or . . . a recorded message published over the telephone." (*Ibid.*) "The right to speak anonymously draws its strength from two separate constitutional wellsprings: the First Amendment's freedom of speech and the right of privacy in article I, section 1 of the California Constitution. The anonymous pamphleteer is one of the enduring images of the American revolutionary heritage." (*Rancho Publications v. Superior Court* (1999) 68 Cal.App.4th 1538, 1540–1541 [81 Cal.Rptr.2d 274].) "While anonymity could be used to conceal dirty tricks, '. . . the interest in having anonymous works enter the marketplace of ideas

---

[7] Once again plaintiffs' simple negation of the challenged statement fails to fairly meet its substance. An assertion that someone "bankrupted many businesses throughout California" may be *substantially* true even if it is literally false. Most obviously, plaintiff might have bankrupted many businesses, but all in one part of the state; or he might have bankrupted only two or three, but in various parts of the state. For that matter, a simple negation that he "bankrupted" businesses might mean no more than that he, personally, did not file a bankruptcy petition. The statement that he "bankrupted many businesses" would be substantially true if he brought about the unremedied insolvency of some number of California businesses. Nothing in this record demonstrates that Grannis could prove the falsity of that proposition.

unquestionably outweighs any public interest in requiring disclosure as a condition of entry.' " (*Id.* at p. 1547, quoting *McIntyre v. Ohio Elections Comm'n* (1995) 514 U.S. 334, 342 [131 L.Ed.2d 426, 115 S.Ct. 1511].)

Plaintiffs also draw repeated attention to an "apology" ostensibly signed by defendant and assertedly printed in a local newspaper. Plaintiffs offered no competent evidence of the relevant facts, including the authenticity of the document, to which defendant objected on the ground (among others) that it lacked foundation. This objection was well taken, since there was no declaration identifying the document or laying a basis for its admission. The trial court thus acted properly in sustaining defendant's objection to this document.

Even if the document were properly before us, it would have no tendency to establish that plaintiffs could succeed on the merits. The apology is addressed not to plaintiffs, but to "Bob Valenzuela, Tracie Cone, and the employees and friends of the Pinnacle . . . ." None of these persons are competently identified in this record. The apology acknowledges that defendant's Web site "contained false and hurtful statements about Bob Valenzuela and Tracie Cone," and it sought "forgiveness from Bob Valenzuela, Tracie Cone, the employees and friends of The Pinnacle, and the citizens of this community." Nowhere does it expressly or impliedly acknowledge that defendant said anything false *about plaintiffs* or felt he had anything to apologize to them for. Nothing in this record ties the apology to plaintiffs' claims in any way.

Plaintiffs contend that the trial court properly excluded defendant's evidence in support of the special motion to strike. Plaintiffs' suggestion that these materials were irrelevant verges on frivolousness. Plaintiffs' remaining objections in the trial court are likewise meritless. Plaintiffs raise a more colorable argument on appeal by asserting that defendant failed to properly authenticate the pleadings from the child support and bankruptcy proceedings involving plaintiffs. It is at least arguable that defendant should have offered certified copies of these materials. However, no such objection was lodged in the trial court, where defendant might readily have cured it. Nor have plaintiffs contested the factual accuracy of these materials. We decline to entertain this objection for the first time on appeal.

Plaintiffs bore the burden of showing that they had pleaded, and had evidence to substantiate, a valid cause of action. They failed to carry that burden in virtually every respect. The order denying the special motion to strike cannot be sustained on this record.

## Disposition

The order under review is reversed with directions to grant the special motion to strike. Costs on appeal to appellant.

Elia, J., and Mihara, J., concurred.