Filed 3/21/16  Nobles v. Karaka CA2/3

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| ANTHONY NOBLES, | B256358 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. LC100903) |
| v. | |
| HAROLD KARAKA et al., | |
| Defendants and Appellants. | |

APPEAL from an order of the Superior Court of Los Angeles County, Huey P. Cotton, Jr., Judge.  Reversed and remanded with directions.

Fish & Tsang and John D. Van Loben Sels for Plaintiff and Appellant.

The Law Offices of Terence Geoghegan and Terence Geoghegan for Defendants and Appellants.

———————————

## INTRODUCTION

Plaintiff Anthony Nobles sued defendants Harold Karaka and HK Enterprises (together defendants) and Karl Ryll alleging that the posting on a website of three paragraphs about Nobles was defamatory. Defendants appeal from the order of the trial court denying their special motion to strike the complaint pursuant to Code of Civil Procedure section 425.16, known commonly as the "anti-SLAPP statute."[1] Nobles appeals challenging the trial court's findings that the lawsuit arises from defendants' protected activity, that Nobles' complaint does not fall within the commercial speech exemption to the anti-SLAPP statute, and that he is a public figure who must prove malice. Exercising our de novo review, we conclude that the lawsuit arises from protected activity within the meaning of section 425.16, and that the exemption does not apply, but that Nobles failed to show he could prevail on the merits because he did not demonstrate prima facie that these defendants published the alleged defamatory statement. Accordingly, we reverse the order with directions to enter an order striking the lawsuit.

## FACTUAL AND PROCEDURAL BACKGROUND

1. *The operative statement*

Karl Ryll registered the domain name TheRealityPIs (The Reality PIs) for a website and a web-based reality series he conceived about private investigators. On that website, Ryll promoted, among other things, H K Enterprises, Karaka's private investigation firm. The Reality PIs declared it was "the public, in-your-face version of *H K Enterprises*, our private investigative agency. Think *alter ego* if you would. The Reality PIs is to H K Enterprises as Batman is to Bruce Wayne . . . ." Continuing, the website states: "If you've ever been wronged criminally . . . . You want and expect some measure of justice . . . . [T]he criminal justice system *alone* cannot always provide it.

---

[1]   All further statutory references are to the Code of Civil Procedure, unless otherwise noted.
    SLAPP is the acronym for "strategic lawsuit against public participation." (*Equilon Enterprises v. Consumer Cause, Inc*. (2002) 29 Cal.4th 53, 57.)

There needs to be another option for reasonable justice when it's [*sic*] needed. . .   [¶]   The Reality PIs *is* that option."

The Reality PIs then includes, under the heading "Our 'Past Masters [*sic*],' " a list of "entertaining synopses of *our most memorable cases*."  (Italics added.)  There follows the allegedly defamatory statement (the operative statement), which reads:

**"The Shocking Deception and Fraud of 'Doctor' Anthony Nobles**

"A case of deception and fraud on a massive scale that involves hundreds of millions of dollars, dozens of domestic and overseas shell corporations, and layers of conspirators.  At the heart of the criminal operation is an alleged California medical doctor named Anthony Nobles whose California-based company is known as *Nobles Medical Technology II, Inc*.  On the company's website, Nobles, 48, is identified as the 'Chairman of The Board & Chief Executive Officer' in a one paragraph biography riddled with typos.  Among other laudatory claims, the bio says that 'Prof. Dr. Nobles hold (sic) multiple degrees including Doctorates in Biomedical Engineering in both Neuroscience and Cardio Vascular (sic) Science.'

"Nobles has been making extraordinary claims that have no basis in reality for over two decades and, even more extraordinary, has been getting away with it!  The persona that this professional huckster has created is so implausible – Nobles claims to be a brain surgeon, inventor, architect, real estate developer, contributing author, and university lecturer (among other things) -  that it would seem unlikely that any sane person could buy into it.  And yet, many (apparently) sane people – including a few in the local media -  *have* bought into his delusion.  And thanks to them, Nobles and his family have been able to live a comfortable, conspicuously opulent lifestyle.  It is an unchecked lifestyle that's been bought and paid for by investors who inevitably end up with nothing but losses in return.

"Nobles carries on publicly as if he has no worries about being exposed.  Perhaps if reporters at *Orange County Weekly*, *KTLA 5 Los Angeles*, and *The Orange County Register* had done their due diligence on recent stories, Nobles might be a bit less confident.  In fact, even after Nobles' Fountain Valley, California home mysteriously

3

burned to the ground on January 8, 2013, *OC Register* reporter Chris Haire raised no suspicions about Nobles' shady background or its possible connection to the $1 million fire."

### 2. *The complaint*

Nobles brought the instant lawsuit against Ryll, Karaka, and HK Enterprises seeking damages for libel and libel per se. His complaint alleges that The Reality PIs website contains multiple false, unprivileged, and defamatory statements, that have caused Nobles to suffer loss to his trade, business, reputation, profession, and occupation. Included in the complaint is a two and a half page description of Nobles' professional background, and attached as an exhibit are lists of the patents Nobles has obtained, the topics on which he has given talks, the institutions and conferences at which he has lectured, and the publications to which he has contributed. Nobles immediately obtained a preliminary injunction forcing the removal of the references to him on The Reality PIs.

### 3. *The special motion to strike brought by Karaka and HK Enterprises*

Nobles filed his request for entry of default judgment against Ryll. Defendants Karaka and HK Enterprises moved to specially strike the complaint.[2] In connection with their motion, defendants submitted the declaration of Ryll, executed under penalty of perjury, in which he stated that he is "the sole owner of the domain, [The Reality PIs.]" Ryll declared he is the website's registrant, administrator, and technology administrator. He applied for the domain, was billed for, and made the payments on, the hosting service. Ryll declared, "*I alone provided the content for the site. Neither Harold Karaka nor any employee or agent of HK Enterprises contributed one keystroke or one mouse click to the site. I alone created the entire site and all of its content. I am the **only** person who ever communicated with* [*the host*] *concerning this website.*" (Italics added, bold in original.) Continuing, Ryll declared that Karaka had never been an owner of, nor had any control over, The Reality PIs project or website. Ryll described the genesis of the website and explained that he asked Karaka if he could review Karaka's past cases to provide an

---

[2] Defendants had already filed their demurrer to the complaint.

4

overview of cases for the site. Ryll conducted his own research into the most high-profile past cases that could be included on the post.

Ryll then declared that in October 2012, Karaka asked him to conduct research into Nobles as part of a possible investigation for potential clients of Karaka's who believed they were being defrauded by Nobles and wanted to assess the probability of recovering invested funds and lost interest. Ryll later "decided" to include in his website the three paragraph narrative on Nobles based on the details Ryll uncovered in this research. Ryll declared that "Karaka's only involvement to date on The Reality PIs project has been as a consultant and possible featured investigator for the potential series and the possibility of utilizing his cases for the series. *He* [*Karaka*] *did not contribute a single word to the website content concerning Anthony Nobles.* [¶ and] *played no part in selecting which past cases would be featured on the website.* [¶] *I have sole responsibility for the concept, implementation, and final product.*" (Italics added.)

In addition to Ryll's declaration, defendants attached to their special motion to strike a series of newspaper articles and declarations from disgruntled investors in both the United States and Canadian stock markets to demonstrate the truth of the matters asserted in the operative statement.

4. *Nobles' opposition to the special motion to strike*

Nobles argued that the operative statement was not constitutionally protected speech. It was commercial speech that was exempt from the protection of the anti-SLAPP statute (§ 425.17, subd. (c)). Even if section 425.16 applied, Nobles argued, he demonstrated the likelihood he would prevail on his claims because the operative statement was "demonstrably false and facially defamatory" and unprivileged. Nobles also asserted that he was a private figure who was not required to prove actual malice.

Nobles' opposition attached his declaration, executed under penalty of perjury, "to include additional information not already included in my declarations previously filed with the Court." This declaration then authenticated seven attached exhibits in an effort to show that the operative statement was false.

5

5. *The hearing on the special motion to strike*

The trial court granted Nobles' request to examine Karaka at the hearing on the anti-SLAPP motion. Karaka testified that he does not work with Ryll. Occasionally, over the past 14 or 15 years, Karaka has asked Ryll to conduct research for him and once, Ryll hired Karaka to investigate some fraud in the Philippines. Karaka explained that in late September 2011, an acquaintance of an investor in Nobles' companies gave Karaka a collection of files on Nobles and asked him to investigate whether he could assist the investor in recovering her money. Karaka conducted a normal background investigation of Nobles by checking public criminal and civil records, and Department of Motor Vehicles databases, to which he has access. He found numerous lawsuits involving Nobles. While he was working, Ryll offered to help, and so Karaka asked Ryll to conduct an internet search of Nobles. Karaka testified, although he discussed with Ryll the results of Ryll's internet search, that he was unaware at the time that Ryll had a website and he did not tell Ryll what to publish on that site.

Reality PIs is Ryll's creation, Karaka testified. Ryll wrote and posted the operative statement. Karaka did not put anything on the website, did not see the operative statement before it was posted, and is not sure when the operative statement was posted. He denied making each of the assertions contained in the operative statement because he did not write what was on the website. Karaka had ceased investigating Nobles in late 2012, and so he only became aware of the website in February or March 2013 when Ryll told him of the January 2013 fire at Nobles' house. Ryll did not tell Karaka that he was going to include a reference to Nobles' fire on the website. HK Enterprises is Karaka's private investigation firm. Karaka disagreed with the website's statement that Reality PIs is the alter ego of HK Enterprises, and told Ryll as much.

At the close of testimony, defendants argued that Nobles offered no evidence, other than the complaint's allegations, that Karaka had control over what was posted on The Reality PIs. They argued that "It can't be stressed enough that the - - the plaintiff

6

here simply has the *wrong defendants*.  There is absolutely *no evidence whatsoever that Harold Karaka or HK Enterprises had anything to do with this website*."  (Italics added.)

The trial court denied the anti-SLAPP motion.  It ruled that defendants had carried their burden in moving under section 425.16 to show that the operative statement was "made in a place open to the public or a public forum in connection with an issue of public interest" under section 425.16, subdivision (e).  The court relied on *Simpson Strong-Tie Co., Inc. v. Gore* (2010) 49 Cal.4th 12 (*Simpson*) to reject Nobles' argument that the commercial speech exception removed this case from the ambit of the anti-SLAPP statute (§ 425.17).  The court next found that most of the speech made in the operative statement consisted of nonactionable statements of opinion, but that the statement that Nobles had committed and conspired to commit fraud "could support a finding of reckless disregard."  Although the court determined that Nobles was a public figure, it also found he had demonstrated a likelihood that defendants lacked reasonable ground for believing the statements were true.  The court never addressed defendants' argument preliminarily that plaintiff failed to show Karaka published the operative statement.  The court gave Nobles 20 days leave to amend his complaint.  Karaka and HK Enterprises filed their timely appeal and Nobles filed his timely appeal.  (§ 904.1, subd. (a)(13).)

## DISCUSSION

1. *The Anti-SLAPP Statute and Standard of Review*

Section 425.16, subdivision (b)(1) provides: "A cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim."

There are two steps to the analysis of an anti-SLAPP motion.  "First, the court decides whether the defendant has made a threshold showing that the challenged cause of action is one 'arising from' protected activity.  (§ 425.16, subd. (b)(1).)  If the court finds

7

such a showing has been made, it then must consider whether the plaintiff has demonstrated a probability of prevailing on the claim." (*City of Cotati v. Cashman* (2002) 29 Cal.4th 69, 76.) "Only a cause of action that satisfies *both* prongs of the anti-SLAPP statute—i.e., that arises from protected speech or petitioning *and* lacks even minimal merit—is a SLAPP, subject to being stricken under the statute." (*Navellier v. Sletten* (2002) 29 Cal.4th 82, 89.)

Analysis of the first prong focuses on the substance of the lawsuit. "[T]he statutory phrase 'cause of action . . . arising from' means simply that the defendant's act underlying the plaintiff's cause of action must *itself* have been an act in furtherance of the right of petition or free speech. [Citation.]" (*City of Cotati v. Cashman*, *supra*, 29 Cal.4th at p. 78.) "The 'principal thrust or gravamen' of the claim determines whether section 425.16 applies." (*Mann v. Quality Old Time Service, Inc*. (2004) 120 Cal.App.4th 90, 103 (*Mann*).) To resolve the issue, we look to the allegations in the complaint and affidavits. (§ 425.16, subd. (b)(2).)

If the defendant makes the requisite showing and the plaintiff asserts its claims are exempt under the commercial speech exemption of section 425.17, subdivision (c), the plaintiff must show the applicability of that exemption. (See *Simpson*, *supra*, 49 Cal.4th at pp. 22-26.)

If the plaintiff does not demonstrate the exemption applies, the plaintiff then has the burden under the second prong of the anti-SLAPP analysis to show a probability that he or she will prevail on the complaint's merits. The "plaintiff's burden of establishing a probability of prevailing is not high." (*Overstock.com, Inc. v. Gradient Analytics, Inc*. (2007) 151 Cal.App.4th 688, 699.) He or she "need only establish that his or her claim has minimal merit to avoid being stricken as a SLAPP. [Citation.]" (*Hailstone v. Martinez* (2008) 169 Cal.App.4th 728, 735.) Toward that end, the plaintiff must adduce evidence that would be admissible at trial, and cannot simply rely on his or her pleadings, even if verified. (*Ibid.*) There is no requirement that the plaintiff " '*prove* the specified claim to the trial court.' " (*Mann*, *supra*, 120 Cal.App.4th at p. 105.) Instead, " 'the plaintiff "must demonstrate that the complaint is both legally sufficient and supported by

8

a sufficient prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited." ' " (*Navellier v. Sletten*, *supra*, 29 Cal.4th 82, 88–89.)

We review an order granting or denying an anti-SLAPP motion de novo. (*Oasis West Realty, LLC v. Goldman* (2011) 51 Cal.4th 811, 820.) We consider the "pleadings, and supporting and opposing affidavits stating the facts upon which the liability or defense is based." (§ 425.16, subd. (b)(2).) We do not weigh credibility nor compare the weight of the evidence. (*Soukup v. Law Offices of Herbert Hafif* (2006) 39 Cal.4th 260, 269, fn. 3.)

2. *This lawsuit arises from protected speech.*

Nobles contends that Karaka and HK Enterprises failed to meet their burden to make a threshold showing that Nobles' defamation causes of action arise from protected speech.

A special motion to strike under the anti-SLAPP statute allows a defendant to obtain the early dismissal of causes of action that are designed primarily to chill the exercise of the right of petition or free speech protected by the First Amendment. (*Wong v. Jing* (2010) 189 Cal.App.4th 1354, 1359 (*Wong*).) The statute sets out four categories of conduct that are subject to a special motion to strike. (§ 425.16, subd. (e).)[3] To make the necessary threshold showing that the alleged activity is protected by the anti-SLAPP procedure, defendants must demonstrate the conduct causing Nobles harm

---

[3] Subdivision (e) of section 425.16 reads "As used in this section, 'act in furtherance of a person's right of petition or free speech under the United States or California Constitution in connection with a public issue' includes: (1) any written or oral statement or writing made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law, (2) any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law, (3) any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest, or (4) any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest."

9

falls within one of these four categories. Relevant to this appeal is the third category listed in subdivision (e) of section 425.16, namely "any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest."

The operative statement here was made in a public forum. "It is settled that 'Web sites accessible to the public . . . are "public forums" for purposes of the anti-SLAPP statute.' [Citations.]" (*Wong*, *supra*, 189 Cal.App.4th at p. 1366, citing *Barrett v. Rosenthal* (2006) 40 Cal.4th 33, 41, fn. 4, *Ampex Corp. v. Cargle* (2005) 128 Cal.App.4th 1569, 1576, *Vogel v. Felice* (2005) 127 Cal.App.4th 1006, 1010, 1015, *Wilbanks v. Wolk* (2004) 121 Cal.App.4th 883, 897, *Bernardo v. Planned Parenthood Federation of America* (2004) 115 Cal.App.4th 322, 358 & *ComputerXpress, Inc. v. Jackson* (2001) 93 Cal.App.4th 993, 1006.) A website whose access is selective is not considered a public forum. (See *Arkansas Ed. Television Comm'n v. Forbes* (1998) 523 U.S. 666, 678-680.) On our own motion, we take judicial notice that TheRealityPIs is freely accessible and open to the public. Therefore, it is indisputable that the operative statement, posted on The Reality PIs website, was made in a public forum.

Additionally, the trial court correctly determined that the operative statement was made in connection with an issue of public interest. " '[N]ot every Web site post involves a public issue.' [Citation.]" (*Wong*, *supra*, 189 Cal.App.4th at p. 1366.) However, "consumer information that goes beyond a particular interaction between the parties and implicates matters of public concern that can affect many people is generally deemed to involve an issue of public interest for purposes of the anti-SLAPP statute." (*Wong*, *supra*, 189 Cal.App.4th at pp. 1366-1367 [posted review on public website about a dentist's use of nitrous oxide and silver amalgam containing mercury when treating children involved issue of public interest]; *Hailstone v. Martinez*, *supra*, 169 Cal.App.4th at p. 738 [oral and written statements that union official who was trustee for union benefits trust was accused of misappropriation of union funds was of concern to 10,000 union members and thus a matter of public interest]; *Carver v. Bonds* (2005) 135 Cal.App.4th 328, 343–344 [newspaper article about medical practitioner whose

10

information would help those choosing doctors involved issue of public interest]; *Wilbanks v. Wolk*, *supra*, 121 Cal.App.4th at pp. 898-899 [statements about insurance broker was a consumer warning to others with similar problems and involved issue of public interest]; *DuPont Merck Pharmaceutical Co. v. Superior Court* (2000) 78 Cal.App.4th 562, 564, 566–567 [accusation that manufacturer distributed false information about efficacy of drug used by many was issue of public interest].)

In contrast, a statement is not a matter of public interest when it is of concern only to the speaker and a relatively small, specific audience, private group, or community, and does not otherwise occur in connection with an ongoing controversy. (*Weinberg v. Feisel* (2003) 110 Cal.App.4th 1122, 1134 [publication of allegation one token collector stole from another not issue of public interest]; *Albanese v. Menounos* (2013) 218 Cal.App.4th 923, 936 [publication of celebrity stylist's alleged theft is a private dispute and not issue of public interest]; *Dyer v. Childress* (2007) 147 Cal.App.4th 1273, 1280 [portrayal of real person in movie not issue of public interest]; *Rivero v. American Federation of State, County and Municipal Employees, AFL-CIO* (2003) 105 Cal.App.4th 913, 924 [article in union newspaper about termination of supervisor of eight people not issue of public interest].)

Our focus in evaluating a moving defendant's showing under the first prong of the anti-SLAPP statute is on the substance of the lawsuit (*City of Cotati v. Cashman*, *supra*, 29 Cal.4th at p. 78) and " 'the *specific nature of the speech* rather than the generalities that might be abstracted from it. [Citation]' [Citation.]" (*World Financial Group, Inc. v. HBW Ins. & Financial Services, Inc*. (2009) 172 Cal.App.4th 1561, 1570.) Here, looking at the speech itself and the complaint, it is apparent that this case entails a matter of public interest. The operative statement accuses Nobles of being a huckster who falsified his academic credentials on which his companies are based, and who engaged in international investor and securities fraud, and criminal conspiracy. As in *Carver*, *Wilbanks*, and *Du Pont Merck Pharmaceutical Co*., these are issues of concern to a substantial number of people, globally, who have invested in Nobles' companies, or who are evaluating those companies to decide whether to invest in them. Based on Nobles'

11

own complaint detailing his international notoriety, the speech does not involve merely the theft of a single investment or a dispute between the statement's publisher and Nobles. The operative statement goes beyond *a particular interaction* to implicate matters of public concern that could affect vast numbers of people. (*Wong*, *supra*, 189 Cal.App.4th at p. 1366.)

Accordingly, we reject Nobles' argument that the statement was made in the context of a private posting to generate business for defendants. Nobles relies on cases that are distinguishable because they involve a private dispute between the parties.[4] *Consumer Justice Center v. Trimedica International, Inc.* (2003) 107 Cal.App.4th 595, did not involve an issue of public interest because the advertisements about a pill offering a natural alternative to breast implants did not involve the general topic of herbal supplements about which the public was interested, and there was no evidence the pill was widely used. (*Id*. at p. 602.) By contrast, the issue here relates to a matter of interest to investors internationally. Nor does *Commonwealth Energy Corp. v. Investor Data Exchange, Inc.* (2003) 110 Cal.App.4th 26, aid Nobles. There, acknowledging that investment scams "*generally* might affect large numbers of people," the specific speech at issue was a telemarketing pitch for a particular service marketed to very few consumers. (*Id*. at p. 34.) Although the operative statement here was an advertisement for The Reality PIs, the specific speech was not targeted to a small group but was posted on a public forum about a matter that generally would be available to large numbers of readers. Therefore, defendants have demonstrated as a threshold matter that the website posting was protected activity under the anti-SLAPP statute because the conduct complained of in Nobles' lawsuit was a statement made in a public forum in connection with an issue of public interest. (§ 425.16, subd. (e).)

---

[4] Nobles cites *Mann*, *supra*, 120 Cal.App.4th 90, which does not concern the category of conduct under subdivision (e) of section 425.16 that is at issue here.

12

3. *The trial court correctly found that the operative statement is not commercial speech that would be exempt from the anti-SLAPP statute.*

In his appeal, Nobles contends, despite defendants' showing under the first prong, that his complaint is nonetheless exempt from the anti-SLAPP statute by section 425.17, subdivision (c).

The Legislature enacted section 425.17 to exempt certain actions from the anti-SLAPP statute because of concerns about the " 'disturbing abuse' " of that statute. (*Simpson*, *supra*, 49 Cal.4th at pp. 21-22, citing § 425.17, subd. (a).) *Simpson* addressed the operation and scope of the exception in subdivision (c) of section 425.17. (*Simpson*, at p. 22.) That subdivision reads, "Section 425.16 does not apply to any cause of action brought against a person primarily engaged in the business of selling or leasing goods or services, including, but not limited to, insurance, securities, or financial instruments, arising from any statement or conduct by that person if both of the following conditions exist: [¶] (1) *The statement* or conduct *consists of representations of fact about that person's or a business competitor's* business operations, goods, or *services*, that is made for the purpose of obtaining approval for, promoting, or securing sales or leases of, or commercial transactions in, the person's goods or services, or the statement or conduct was made in the course of delivering the person's goods or services. [¶] (2) The intended audience is an actual or potential buyer or customer, or a person likely to repeat the statement to, or otherwise influence, an actual or potential buyer or customer . . . ." (§ 425.17, subd. (c), italics added.) This exception should be narrowly construed. (*Simpson*, *supra*, at p. 22.) As the facts are undisputed, we review the applicability of the commercial speech exception de novo. (*Id*. at p. 26.)

In *Simpson*, our Supreme Court held that the commercial speech exemption did not apply to the plaintiff's complaint alleging defamation, trade libel, false advertising and UCL violations against an attorney whose advertisement for his law firm's services contained allegedly defamatory statements about the plaintiff's galvanized screw products. (*Simpson*, *supra*, 49 Cal.4th at pp. 17-20, 30.) *Simpson* held, focusing on the first necessary condition, italicized above, that any implication in the advertisement that

13

the screws were defective " 'is not "about" [the defendant attorney's] or [the defendant attorney's] competitor's "business operations, goods, or services . . . ." (§ 425.17[, subd.] (c)(1).) It is, rather, a statement "about" [the plaintiff]—or, more precisely, [the plaintiff's] products.' It therefore falls squarely *outside* section 425.17(c)'s exemption for commercial speech." (*Simpson*, at p. 30, italics added.)

Likewise here, Nobles' complaint alleges that the operative statement is false and defamatory. As the *Simpson* court did, we assume arguendo that the operative statement implies that Nobles is a criminal huckster who engages in investor fraud. (*Simpson*, *supra*, 49 Cal.4th at p. 30.) However, that implication " 'is not "about" [defendants'] or [defendants'] competitor's "business operations, goods, or services . . . ." (§ 425.17[, subd.] (c)(1).)' " (*Ibid.*) Instead, it is an assertion " 'about' [Nobles]," with the result the operative statement falls outside the exemption for commercial speech under section 425.17, subdivision (c). (*Simpson*, *supra*, at p. 30.)

Nobles argues that he has met every element of the commercial speech exemption in that, (1) defendants are primarily engaged in the business of private investigation services; (2) Nobles' defamation action arose from the operative statement *about Nobles*, which was intended to demonstrate the efficacy of defendants' services; (3) the operative statement was made for the purpose of promoting defendants' services; and (4) the intended audience were customers likely to repeat the defamatory statements. However, Nobles misapprehends the italicized portion of the exemption as analyzed in *Simpson*. It requires that the operative statement "consist[] of representations of fact *about that person's* [i.e., *defendants'*] or [*defendants'*] *business competitor's business operations*, goods or services," not about plaintiff's business operations. (§ 425.17, subd. (c)(1), italics added.) Nobles failed to carry his burden to show that this complaint falls within the commercial speech exemption to the anti-SLAPP statute, and so the first prong of the anti-SLAPP analysis is satisfied.

14

4. *Nobles has not demonstrated a probability of prevailing on the merits of his defamation cause of action.*

As this lawsuit arises from protected activity and as the complaint is not exempt from the reach of the anti-SLAPP statute, the burden fell to Nobles to demonstrate prima facie his likelihood of prevailing on the merits of his complaint. (§ 425.16.) Karaka and HK Enterprises contend that Nobles has failed to carry his burden because he did not show that these defendants made the allegedly defamatory statement. Effectively, defendants contend that Nobles failed to allege and substantiate his claim that defendants played a responsible part in the publication of the operative statement and so Nobles has no defamation claim against them. We agree.

Defamation requires the intentional publication of a false and unprivileged statement of fact. (*Mann*, *supra*, 120 Cal.App.4th at p. 104.) A plaintiff's first task is to show that the defendant made the allegedly defamatory statement. (See *Gallagher v. Connell* (2004) 123 Cal.App.4th 1260, 1266 [slander action]; accord, 6A Cal.Jur.3d (2011) Assault and Other Wilful Torts, § 182.) We review a special motion to strike independently. (*Oasis West Realty, LLC v. Goldman*, *supra*, 51 Cal.4th at p. 820.) Accordingly, we must address this element of Nobles' defamation causes of action regardless of whether the trial court did.

"To be actionable, the publication must be in fact made by the defendant." (5 Witkin, Summary of Cal. Law (10th ed. 2005) Torts, § 535, p. 787.) "One who takes a responsible part in a publication of defamatory material may be held liable for the publication." (*Overstock.com, Inc. v. Gradient Analytics, Inc.*, *supra*, 151 Cal.App.4th at p. 712, citing *Shively v. Bozanich* (2003) 31 Cal.4th 1230, 1245.) In *Overstock.com, Inc*, the plaintiff demonstrated a likelihood of prevailing on his defamation action under the anti-SLAPP statute by showing that the investor defendants played a responsible part in the publication. The defendants there initiated a negative campaign, solicited frequent, negative reports on the plaintiff company, regularly communicated with the editor about the substance of the allegedly defamatory reports, who received and reviewed the reports in advance of publication, exercised editorial influence over the substantive content of the

15

reports, and controlled the timing of the publication. (151 Cal.App.4th at p. 712; see also *Hawran v. Hixson* (2012) 209 Cal.App.4th 256, 276-277.)

By comparison, however, courts have held that the defendants did not play a responsible part in the publication of the alleged defamatory material where they did not participate in preparing the defamatory matter, know of its contents in advance of publication, know of the falsity of publication, or hold an oversight position. (*Matson v. Dvorak* (1995) 40 Cal.App.4th 539, 549 [plaintiff cannot show likelihood of prevailing on defamation claim under § 425.16 because mere financial contributor to campaign did not play a responsible part in the publication of defamatory campaign mailer]; *Sakuma v. Zellerbach Paper Co.* (1938) 25 Cal.App.2d 309, 321-322 [newspaper's business manager played no responsible part in publication of statements in a language he did not understand].)

This case is like *Matson* and *Sakuma* because Nobles made no showing that Karaka or HK Enterprises played a responsible part in the publication of the operative statement. Nobles cites his complaint's allegations. However, the allegations in the complaint are legally insufficient evidence in opposing an anti-SLAPP motion. (*Hailstone v. Martinez*, *supra*, 169 Cal.App.4th at p. 735.) Looking at the factual record, it shows that neither Karaka nor any employee of HK Enterprises participated in writing or posting the statements to the website; Ryll was the sole creator. Karaka repeatedly testified that he did not compose a single word on the website, did not tell Ryll what to publish there, and did not know of the website's content, or when the operative statement was published. Karaka only learned that the website existed after the operative statement was posted. There is no evidence that Karaka had any oversight or responsibility or that he directed Ryll to obtain the domain name or to post anything on the web that would support Nobles' contention that Karaka agreed to and approved of, or had a responsible part in the publication.

Nobles counters that The Reality PIs is the alter ego of HK Enterprises. For this proposition, Nobles relies on the website's statement, "Think *alter ego* if you would." However, on the witness stand, Karaka pointedly disavowed that statement and related

16

that he told Ryll as much.  Next, Nobles argues that *Karaka* must have control over The Reality PIs because references to Nobles were taken down from the website in response to the trial court's preliminary injunction.  However, Karaka testified that, in response to the court's injunction, *Ryll* took the site down.  All Karaka did was to alert Ryll to the court's order.

Nobles adduced no other evidence to justify piercing the corporate veil and holding HK Enterprises liable as the alter ego of The Reality PIs.  Under the alter ego doctrine, " ' "where a corporation is used by an individual or individuals, or by another corporation, to perpetrate fraud, circumvent a statute, or accomplish some other wrongful or inequitable purpose, a court may disregard the corporate entity and treat the corporation's acts as if they were done by the persons actually controlling the corporation. . . ." [Citation.]' [Citation.]  When a court does so, it is said to have " 'pierced the corporate veil.' " (*Toho-Towa Co., Ltd. v. Morgan Creek Productions, Inc.* (2013) 217 Cal.App.4th 1096, 1106-1107 (*Toho-Towa Co.*).)

Whether the evidence has established that the corporate veil should be ignored so as to hold one entity liable as the alter ego of another, is primarily a question of fact. (*Toho-Towa Co.*, *supra*, 217 Cal.App.4th at p. 1108.)  Among the factors courts consider are, " 'the commingling of funds and assets of the two entities, identical equitable ownership in the two entities, use of the same offices and employees, disregard of corporate formalities, identical directors and officers, and use of one as a mere shell or conduit for the affairs of the other. [Citation.]  "No one characteristic governs, but the courts must look at all the circumstances to determine whether the doctrine should be applied." ' " (*Id*. at pp. 1108-1109.)

Here, the record is devoid of evidence of these factors to justify the conclusion prima facie that The Reality PIs website is the alter ego of HK Enterprises, notwithstanding Ryll's gratuitous statement on the website.  There is no evidence of asset or fund commingling, corporate formality use of offices or employees, identification of directors or officers.  Instead, Nobles cites Karaka's mere acknowledgment that he knows what it means for one company to be the alter ego of another.  This is hardly an

17

admission that The Reality PIs is the alter ego of HK Enterprises. As for identical ownership, although Karaka owns HK Enterprises, there is no evidence that Ryll has any equitable or financial interest in the company. Nobles argues that Karaka testified he had been " 'associated' " with Ryll for 14 or 15 years. Yet, "associated" was Noble's counsel's word, and the statements of attorneys are not evidence. (*Estate of Silver* (1949) 92 Cal.App.2d 173, 176.) All that Karaka testified to was that he *worked* with Ryll; he occasionally asked Ryll to do some research, and Ryll once hired him to investigate fraud. Although Karaka testified he asked Ryll to conduct an internet search on Nobles, there is nothing in the record to indicate that Karaka *directed* an outcome or even *knew* that Ryll published his research results on the internet. Given the absence of any alter ego evidence, Nobles failed to carry his burden to show prima facie that The Reality PIs is the alter ego of HK Enterprises.

To summarize, viewing the evidence submitted by Nobles de novo, it fails to show that Karaka or HK Enterprises played any part in the publication of the alleged defamation. Therefore, Nobles has not carried his burden in opposing the anti-SLAPP motion to make a prima facie showing that the moving defendants made the alleged defamatory statement. Having resolved the issue on this ground, we need not address Nobles' contention that he is not a public figure.[5]

---

[5] The requests for judicial notice, filed on April 20, 2015 and January 6, 2016, by defendants Karaka and HK Enterprises, are denied.

18

**DISPOSITION**

The order denying the special motion to strike is reversed and the matter is remanded to the trial court with directions (1) to enter a new and different order striking plaintiff's complaint in its entirety and dismissing the lawsuit, and (2) to hold a hearing, following further briefing, to award defendants the attorney fees to which they are entitled under section 425.16. Defendants Karaka and HK Enterprises shall recover costs on appeal.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

ALDRICH, Acting P. J.

We concur:

LAVIN, J.

JONES, J.*

---

*        Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.